**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: April 05, 2018.**

_Craig A. Gargotta_
_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: FWLL, Inc. | ) | Case No. 15-52071-CAG |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| RANDOLPH N. OSHEROW, | ) | |
| Chapter 7 Trustee | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Adv. No. 16-05023 |
| TEXAS SILICA LOGISTICS JOINT | ) | |
| VENTURE, ZSV, LLC, POTH | ) | |
| ANDREW MCSTAY, AND DAVID | ) | |
| ZEHR, M.D. | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION DENYING DR. DAVID ZEHR'S MOTION FOR JUDGMENT

Came on to be considered the above-numbered adversary proceeding and, in particular,

Defendant Dr. David Zehr's Motion for Judgment ("Motion") (ECF No. 130); Plaintiff Randolph

N. Osherow, Chapter 7 Trustee's ("Trustee") Response in Opposition ("Response") (ECF No.

143), and Dr. David Zehr's Reply Brief ("Reply") (ECF No.146).[1]  The Court took this matter

under advisement on November 9, 2017. For the reasons stated herein, the Court finds that

Defendant's Motion should be **DENIED** and Judgment **GRANTED** to the Plaintiff under Counts

I and II of the Amended Complaint. Further, to the extent permissible under statute or contract,

Trustee may file his motion for costs and attorney's fees under Fed. R. Civ. P. 54, Fed. R. Bankr.

P. 7054, and Local Rule 7054.

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334. The parties have

consented to this Court's authority to issue a final order. (ECF Nos. 12 and 13); *see also **Wellness***

***Int'l Network, Ltd. v. Sharif (In re Sharif)***, 135 S. Ct. 1932, 1948 (2015) (finding that where the

parties consent to a bankruptcy court issuing a final order confers constitutional authority on the

court). This Court has jurisdiction to enter a final order with regard to matters presently under

submission pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a) and (b), and the Standing Order of

Reference of Bankruptcy Matters entered by the United States District Court for the Western

District of Texas. This Memorandum Opinion constitutes the Court's written findings of fact and

conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## PROCEDURAL BACKGROUND

Trustee initiated this adversary proceeding by filing his Original Complaint on March 31,

2016. (ECF No. 1). Trustee's Complaint seeks recovery under 11 U.S.C. § 547 (preferential

transfers), 11 U.S.C. § 548 (fraudulent transfers), and attorney's fees and costs. Trustee amended

his Complaint on November 28, 2016, and added claims for relief under 11 U.S.C. § 544

(incorporating a cause of action under Tex. Bus. & Comm. Code Ann. § 24 (West 2018))[2],

---

[1] "ECF" denotes the electronic case filing in Adversary No. 16-05023.

[2] Referred to as the Texas Uniform Fraudulent Transfer Act ("TUFTA"), Tex. Bus. & Comm. Code § 24.001 *et seq.*

additional claims under §§ 547 and 548[3], and piercing the corporate veil pursuant to Tex. Bus. Orgs. Code Ann. § 21.223 (West 2018) (ECF No. 136). All Defendants timely answered.

The above-referenced adversary proceeding came before this Court for trial on September 11 and 12, 2017, and November 8 and 9, 2017. Defendant Dr. David Zehr (Zehr) filed the Motion during the trial seeking a take nothing judgment on Trustee's Counts I, II, and VIII.[4] The Court deferred ruling on the Motion until conclusion of trial. After trial, the Defendants moved for a take nothing judgment under Rule 52(c) as to whether the Trustee had proved: (a) an actual and/or constructively fraudulent transfer pursuant to § 548 (Count I); (b) an actual and/or constructively fraudulent transfer pursuant to § 544 and TUFTA (Count II); and piercing ZSV LLC's ("ZSV") corporate veil to hold the LLC members, including Zher, individually liable (Count VIII). The Court allowed further briefing and responses, which have been submitted and reviewed. After trial, the Court took the matter under advisement.

**A. Parties Summary Judgment Motions**

Prior to this matter going to trial, both parties filed motions for summary judgment. Trustee filed his Motion for Partial Summary Judgment on Count I: Avoidance of a Fraudulent Transfer to Defendant David Zehr, M.D. Pursuant to 11 U.S.C. § 548. (ECF No. 42). Trustee requested that the Court find that FWLL, by and through its attorneys Pulman, Cappuccio, Pullen, Benson & Jones ("PCPBJ"), fraudulently transferred $2,518,394.09 to Dr. David Zehr ("Zehr"), because Zehr had no claim to the money transferred, had no claims against FWLL, and did not provide anything of value to FWLL in exchange for the transfer. Defendant Zehr filed his Response in opposition on April 17, 2017. (ECF No. 51). Zehr argued that Trustee waived his fraudulent

---

[3] All references are to 11 U.S.C. § 101 *et seq.* unless specifically noted.

[4] Defendants' counsel for Texas Silica Logistics Joint Venture ("TSL"), ZSV, LLC, and Poth Andrew McStay orally joined in Zehr's Motion for Judgment during trial. (ECF No. 137, p. 218).

transfer claim because Trustee had failed to plead constructive fraud under § 548. Further, Zehr argued that Debtor received reasonably equivalent value under the settlement between Debtor and TSL, ZSV, Zehr, Andrew McStay ("McStay") and Butch Leatherman ("Leatherman"). Also, Zehr argued that Trustee could not rely on a presumption of insolvency for purposes of proving a constructive fraudulent transfer. Defendants TSL, ZSV, and McStay filed their Response in opposition on April 17, 2017, alleging that the transfer was not voidable because the Trustee did not seek to avoid the settlement between the Debtor and TSL, ZSV, Zehr, McStay and Leatherman. (ECF No. 48). Additionally, all Defendants asserted that the settlement could not be avoided because Zehr took it in good faith and for value pursuant to § 548(c)[5] and cannot be recovered under §550(a)[6]. Trustee filed his reply on April 24, 2017. (ECF No. 61).

The Court denied Plaintiff's Motion for Partial Summary Judgment, reading its ruling into the record on June 5, 2017.[7] The Court did, however, make two determinations under § 548(a)(1)[8] that apply to the Trustee's claims for relief. The Court determined

> [t]he Trustee's summary judgment evidence shows the $2,518,394.09 transferred to Zehr was FWLL's property. Specifically, the $2,518,394.09 was FWLL's proceeds from the Buffalo Proppants Settlement Agreement. Further, the Trustee's summary judgment evidence shows that FWLL was the only plaintiff in the Buffalo Proppants Litigation. Thus, FWLL was the only party that settled any claims against Buffalo Proppants and/or INVX Global pursuant to the Buffalo Proppants Settlement Agreement, and under the terms of that agreement, FWLL was the only party entitled to receive payment of the $2,518,394.09. The Trustee's

---

[5] Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation. 11 U.S.C.A. § 548(c) (2018).

[6] "Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from . . . the initial transferee of such transfer . . . ."11 U.S.C.A. § 550(a)(1) (2018).

[7] The transcript of the Court's ruling is at ECF No. 96.

[8] The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition . . . . 11 U.S.C.A. § 548(a)(1) (2018).

4

summary evidence shows that the $2,518,394.09 was placed in the IOLTA trust account of FWLL's attorneys PCPBJ, which represented FWLL and only FWLL, in connection with the Buffalo Proppants Litigation, the Buffalo Proppants Settlement Agreement, and made the transfer to Zehr by check in Zehr's name only.

* * *

FWLL filed its bankruptcy petition on August 27, 2015 ("Petition Date"), and the transfer of the $2,518,394.09 to Zehr was made on or about July 8, 2015, fifty-one (51) days (and less than two years) before the Petition Date. *See* 11 U.S.C. § 548(a)(1). As such, the transfer occurred within two years of the petition date.

Defendant Zehr filed his Motion for Summary Judgment arguing that Trustee cannot avoid the settlement sum because he never sought to avoid the underlying settlement; that Zehr took the settlement funds in good faith and for value under § 548(c); that Trustee cannot avoid the Settlement Sum pursuant to § 544 and TUFTA because Zehr took it in good faith and for value; and that Zehr had defenses under § 550 because he was not the initial transferee as to the settlement funds.

Trustee filed his Response in opposition to the Zehr Motion for Summary Judgment. (ECF No. 49). The Court denied Zehr's Motion for Summary Judgment and read its ruling into the record on June 5, 2017. See ECF No. 96 (transcript of the ruling). Although the Court denied Zehr's Motion for Summary Judgment, the Court held that the Trustee's summary judgment evidence shows that Zehr is the initial transferee, and therefore, he is strictly liable for the $2,518,394.09 transfer should the Court find that the transfer was fraudulent.

## FACTUAL BACKGROUND AND UNCONTESTED FACTS

Trustee filed his Uncontested Facts Previously Established by the Court's June 15th Rulings and the Bankruptcy Case Record (ECF No. 113). Defendants argue that Trustee's statement of uncontested facts is incorrect. As such, the Court will restate those facts the Court found were not in dispute when the Court ruled on Trustee's Motion for Partial Summary Judgment and Zehr's Motion for Summary Judgment.

## A. The formation of FWLL and TSL.

FWLL's business was to buy, sell, transload, and store frac sand from the mine to the rig site, for drilling oil and gas wells. FWLL's primary customers were drilling companies, including Halliburton, Lewis Energy, C&J, and others. FWLL's financial problems began at its inception. FWLL opened its doors on May 5, 2014, and by June 2014, it had forty-seven (47) customers and about $45–50 million in open purchase orders, which it could not fill. FWLL's Manager and "CEO," Stan Bates ("Bates") testified that FWLL needed $48 million/month of revenue or cash-flow to fulfill those orders, so he hired Gary Cain, through Trinity Global Funding Group, Inc., ("Cain") to "generate $794 million in cash-flow." Cain was paid $30,000/month as a consultant, and worked for FWLL from September 2014 to May 22, 2015.

After Cain was hired, FWLL started looking for private investors on a bigger scale. FWLL also started seeking money from additional individual investors who—through seven joint ventures or partnerships with FWLL—invested millions of dollars. The joint ventures had no operational control over FWLL's frac sand business, nor did the joint ventures own the sand until it was sold. On or about April 29, 2014—about six days before FWLL opened it doors—FWLL and ZSV entered into a joint venture called Texas Silica Logistics Joint Venture ("TSL"), which was the first joint venture FWLL formed.

FWLL was the Manager of TSL and owned 45%, and ZSV owned 55%. ZSV is a Texas limited liability company, created to form TSL with FWLL. ZSV provided the money for TSL, and TSL used the money to purchase sand. At all relevant times, Zehr—a licensed physician who lives and works in Texas—was the majority owner of ZSV. ZSV's minority owners were McStay and Leatherman, who is not a party to this adversary proceeding. McStay was the authorized managing member of ZSV. Leatherman "sat in [FWLL's] office" and represented Zehr and

McStay for "six months or so until his health deteriorated." Under the terms of the TSL joint venture agreement ("TSL JVA"), which McStay prepared, the joint venture would periodically distribute "the entire gross profit generated," based on the percentage of ownership. The 11–518 further provided, "Gross profit shall be determined by the sum of all [v]enture revenue less only the budgeted operating expense, which shall also be allocated to [FWLL and ZSV]" based on their respective percentages of ownership.

On or about April 29, 2014, ZSV and TSL executed a Promissory Note ("Note"), that McStay prepared, under which ZSV agreed to loan TSL $2.4 million for the purchase of frac sand. The money for this loan came from Zehr, individually, who placed the money into ZSV, which then entered into the Note with TSL. Zehr, individually, was not a party to the Note. Zehr did not do anything in TSL or ZSV except provide money. Zehr was the only investor in ZSV, and under section 3.3(e) of the TSL JVA, "FWLL and its principals agree[d] . . . not to use any funding source other than ZSV to supply [frac sand] from the effective date [of the TSL JVA] until the termination of the Venture unless specifically authorized by ZSV in advance in writing." Zehr's investment of approximately $4.2 million in ZSV—which, in turn, was used by TSL—does not suggest that Zehr was completely passive about his interest in FWLL, ZSV's joint-venture partner. In addition to Zehr's personal knowledge, because McStay was Zehr's agent and his lawyer, McStay's knowledge about FWLL's financial condition is imputed to Zehr.

On or about April 29, 2014, TSL and ZSV executed a security agreement, under which TSL was denominated the "Debtor" and ZSV was denominated the "Secured Party." The security agreement purported to give ZSV a security interest in TSL's accounts receivable and inventory and the proceeds of same. The security agreement did not give ZSV a security interest in all of

TSL's assets, and Zehr, individually, was not a party to the Security Agreement. The Security Agreement did not give ZSV a security interest in FWLL's assets, either.

**B. The FWLL-Buffalo Proppants litigation.**

On or about July 24, 2014, FWLL entered into a "Memorandum of Understanding (Operating Agreement)" with Buffalo Proppants, LLC ("Buffalo Proppants MOU").  Under the Buffalo Proppants MOU, Buffalo Proppants, LLC ("Buffalo Proppants") was to procure and ship frac sand that FWLL would then sell to its customers, the frac sand end users.

TSL, ZSV, McStay, and Zehr were not parties to the Buffalo Proppants MOU, which required FWLL to deposit approximately $3 million (about half the amount needed to pay for one month's order of frac sand) into an escrow account, and until a final contract was executed, only FWLL was authorized to withdraw funds from the escrow account.

On or about July 24, 2014, FWLL and Buffalo Proppants entered into a Joint Order Escrow Contract with INVX Global Partners, LLC ("INVX") as Escrow Agent or "Escrowee" ("Escrow Agreement").  On July 30, 2014, FWLL wire transferred $3 million to INVX to establish an escrow account under the Escrow Agreement.

On September 16, 2014, FWLL contacted INVX to request instructions for expediting the recall of funds from the escrow account.  On September 18, 2014, FWLL sent INVX copies of the Buffalo Proppants MOU, the Escrow Agreement, and an executed Recall Notice.  On September 22, 2014, FWLL executed a second Recall Notice, in substantially the same form as Exhibit A to the Escrow Agreement, on September 23, 2014.  Subsequently, INVX notified FWLL that INVX would not release the funds to FWLL because Buffalo Proppants had a competing claim to the funds.

McStay and Zehr knew about these problems with Buffalo Proppants and INVX, demanded the return of ZSV's money, and took steps to ensure that $2,518,394.09 went directly to Zehr individually.

On September 24, 2014, FWLL filed suit against Buffalo Proppants and INVX in the 45th Judicial District Court of Bexar County, Texas; and the litigation was removed to the United States District Court for the Western District of Texas, *FWLL, LLC v. Buffalo Proppants, LLC and INVX Global Partners, LLC*, Civil No. SA-14-CV-00929-HLH ("Buffalo Proppants Lawsuit").

On April 17, 2015, the parties to the Buffalo Proppants Lawsuit entered into a Mutual Release and Settlement Agreement ("Buffalo Proppants Settlement Agreement"). TSL, ZSV, McStay, and Zehr were not parties to the Buffalo Proppants Settlement Agreement.

Under the terms of the Buffalo Proppants Settlement Agreement: (a) FWLL paid Buffalo Proppants $25,000 for the release of all claims against FWLL; (b) INVX agreed to pay FWLL the balance of all funds in the escrow account (approximately $2,364,560) within twenty-four hours of the Effective Date; (c) also within twenty-four hours of the Effective Date, INVX's attorneys agreed to transfer $270,000 to FWLL; and (d) INVX agreed to pay FWLL a discounted deficiency payment of $300,000 on or before July 3, 2015, to replace some of the escrowed funds that the escrow agent had converted. INVX also agreed to execute an Agreed Final Judgment against INVX Global Partners, LLC ("Agreed Judgment") and in favor of FWLL, which Agreed Judgment would be entered if INVX failed to make any payments under the Buffalo Proppants Settlement Agreement. As described in the Settlement, the settling parties wished to "end their joint venture relationship, release each other and return to ZSV the proceeds of the Buffalo Settlement Agreement." The Debtor also assigned its "right, title and interest in TSL to ZSV."

On or about June 8, 2015, FWLL received $2,518,394.09 from INVX. That money was deposited into the IOLTA account of FWLL's attorneys Pulman, Cappuccio, Pullen, Benson & Jones ("PCPBJ"). INVX, however, failed to make the additional payment of $300,000 on or before July 3, 2015, and on July 7, 2015, the Agreed Judgment in favor of FWLL and against INVX, in the principal amount of $415,358.75, was signed by Senior United States District Court Judge Harry Lee Hudspeth and entered on the docket in the Buffalo Proppants Lawsuit.

## C. The TSL Settlement Agreement.

On or about July 6, 2015, FWLL, TSL, ZSV, Zehr, McStay, and Leatherman entered into a Settlement and Mutual Release Agreement ("TSL Settlement"), pursuant to which FWLL: (a) assigned its right, title, and interest in TSL to ZSV; (b) agreed to pay ZSV $2,518,394.09 as consideration for the settlement("Settlement Sum"); and (c) agreed to pay ZSV the additional $300,000 due from INVX on July 3, 2015, or if the money was not received by July 3, 2015, to assign to ZSV FWLL's rights under the Agreed Judgment. The parties also agreed to dissolve TSL and parties granted mutual releases, but in this adversary proceeding, Zehr has admitted that FWLL did not owe any debt to him personally, and that he had no claims against FWLL to release.

The consideration that the Debtor received for payment of the Settlement Sum and assigning the Agreed Judgment to ZSV included: (1) ZSV returned the original Promissory Note to the Debtor and marked it "paid in full," pursuant to section 2 of the Settlement; (2) the ZSV Parties (defined to be ZSV, Zehr, McStay, and Leatherman collectively) agreed to indemnify and defend the Debtor and its counsel for any claims brought from the effective date of the Settlement forward against TSL or against the Debtor in its capacity as a joint venture partner of TSL, as described in paragraph 4 of the Settlement; and (3) the ZSV Parties fully released the Debtor and its related parties pursuant to section 5.1 of the Settlement, which included the claims ZSV had for

the additional sums owing to it by the Debtor as well as releasing ZSV's claims on the Debtor's assets pursuant to the Security Agreement.

On or about July 8, 2015, PCPBJ—which had represented FWLL in the Buffalo Proppants Lawsuit—issued a check from PCPBJ's IOLTA account for $2,518,394.09, made payable to the order of David Zehr. Zehr was the only payee named on that check, and he used the $2,518,394.09 to pay off his personal lines of credit at Independent Bank.

On or about August 7, 2015, FWLL assigned its rights in the Agreed Judgment against INVX to ZSV. The Agreed Judgment in the principal amount of $415,358.75 did not represent TSL's accounts receivable, inventory, or the proceeds of TSL's accounts receivable or inventory, if any, on which ZSV purportedly had a security interest.

On August 27, 2015, FWLL filed a voluntary petition under chapter 11 of the Bankruptcy Code, *In re FWLL, LLC*, Case No. 15-52071-cag ("Bankruptcy Case"). On October 9, 2015, creditor 2040 Babcock, Ltd. filed a motion to convert FWLL's Chapter 11 case to Chapter 7. On November 4, 2015, the Court entered an order converting FWLL's case to Chapter 7, and Randolph N. Osherow was appointed Chapter 7 trustee.

### LEGAL STANDARD FOR JUDGMENT UNDER FED. R. CIV. PROC. 52(C).

The Court may render judgment on partial findings after hearing all the evidence. Fed. R. Civ. P. 52(c); Fed. R. Bankr. P. 7052. The Court is not bound by the denial of a motion for judgment as a matter of law made at the conclusion of plaintiff's case. *See Weissinger v. United States*, 423 F.2d 795, 797–98 (5th Cir.1970). As the ultimate fact-finder in a bench trial, the Court need not draw any special inferences in favor of the non-movant. *Premier Capital Funding, Inc. v. Earle (In re Earle)*, 307 B.R. 276, 289 (Bankr. S.D.Ala.2002); *Regency Holdings (Cayman), Inc. v. The Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 374

(Bankr. S.D.N.Y.1998). Rather, the Court may weigh the evidence, resolve any conflicts, and decide where the preponderance of evidence lies. *Earle,* 307 B.R. at 289; *Regency Holdings,* 216 B.R. at 374. As noted, Trustee must prove Counts I and II by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991) (applying a preponderance of evidence standard to dischargeability actions).

## FINDINGS OF FACT

In addition to the Court's determination of undisputed facts at the summary judgment phase of this adversary proceeding, the Court received into evidence both testimony of witnesses and documents in support of the parties' positions at trial. Each witness's testimony is summarized below as it relates to Trustee's claim for relief and the Defendants' defenses. The Court finds that all the witnesses that testified were credible except Gary Cain.[9]

### A. Randy Pulman

Pulman is a partner with the law firm of Pulman Cappucio Pullen Benson & Jones (PCPBJ). (ECF No. 121, p. 76). Pulman's firm represented FWLL in several lawsuits and placed FWLL into chapter 11 bankruptcy. (*Id.* at 77). Pulman represented FWLL in the Buffalo Proppants litigation. (*Id.*), Ex. P-22 (Amended Complaint).[10] Pulman acknowledged that the Buffalo Proppants litigation ended with a settlement. (*Id.* at 82), Ex. P -28 (A Mutual Release and Settlement Agreement). Pulman stated that the settlement funds were deposited into his firm's IOLTA account and that a check was issued to Zehr. (*Id.* at 82, 89), P-38. Pulman explained that

---

[9] Transcripts of the trial are on the Court's electronic docket. The transcript of the September 11, 2017, trial date is at ECF No. 121. For purposes of this Memorandum Opinion, ECF No. and page will indicate references to the trial transcripts. The Trustee called Gary Cain as adverse witness. On the advice of counsel, Mr. Cain invoked a blanket Fifth Amendment as to any questions that Trustee's counsel asked. (ECF No. 121, pp. 175–81). As such, the Court cannot make any credibility determination of Cain's testimony. Notably, Cain, along with Carlos I. Urseti, were convicted of conspiracy to commit wire fraud, money laundering, and offense of engaging in monetary transactions in property from specified unlawful activity. *See* ECF No. 148 (verdict of the jury). Sentencing has not yet occurred.
[10] Ex. P-22 denotes "Plaintiff Exhibit" and "D" denotes Defendants' Exhibit.

the settlement check was issued to Zehr, and not ZSV, because Zehr's lawyers requested that the check be issued to Zehr directly. (*Id*. at 87). Further, Pulman believed that Zehr was the 100% owner of either TSL or ZSV. (*Id*.). Pulman acknowledged that the settlement consisted of two cash payments and an agreed judgment. (*Id*. at 93–94), P-37 (Agreed Judgment).

Pulman testified that he drafted the TSL Settlement Agreement. (*Id*. at 116), P-34. Pulman explained that he was unsure as to who was entitled to the settlement proceeds, and, as such wrote the settlement agreement to state that ownership of the funds was unclear. (*Id*. at 116–17). Pulman stated that while he was negotiating the settlement agreement that FWLL was contemplating filing bankruptcy in February 2015 because of other pending or threatened lawsuits against FWLL. (*Id*. at 125). Pulman acknowledged that part of the settlement agreement included covenants not to sue, indemnifications, and releases. (*Id*. 128–30). Pulman further indicated that had the settlement funds not come from his IOLTA account, he doubted that FWLL would have been able to fund the settlement payment. (*Id*. at 134).

Pulman stated that his firm assisted FWLL in filing chapter 11 bankruptcy. (*Id*. at 95–96), P-42 (FWLL chapter 11 petition). Pulman reviewed FWLL's bankruptcy schedules and statement of financial affairs. (*Id*. at 96–97), P-42. Trustee's counsel directed Pulman to an unliquidated claim against Halliburton for $7.5 million. (*Id*. at 98). Pulman explained that he never made demand against Halliburton or filed a suit against Halliburton because FWLL's contract with Halliburton was terminable at will, and, therefore there was no claim to be made. (*Id*.). Pulman also testified that he believed that there were outstanding or potential lawsuits by some investors against FWLL for their investment in the range of $5 million - $8 million. (*Id*. at 146).

13

## B. Richard Thum

Richard Thum is the president of Five Star Cleaners. (*Id*. at 184). Guillermo Hoyos approached Thum about investing in FWLL. (*Id*. at 185). After meeting Stan Bates, the president of FWLL, Thum decided to invest in FWLL. (*Id*.). Bates represented to Thum that FWLL had $17 million in accounts receivables and $18 million in cash. (*Id*. at 187). Further, Bates stated that Thum's investment would be "secured" with an expected rate of return of 20 percent. (*Id*.). Thum participated in a joint venture between 2040 Babcock Ltd. (which Thum and his wife owned) and FWL-MX, LLC. (*Id*.), P-60 (2040 Babcock, Ltd. – FWL-MX, LLC joint venture agreement). When Thum was not paid back for his investment, Thum sought injunctive relief against FWLL and asked that FWLL's bank accounts be frozen. (*Id*. at 196). Thum subsequently took a default judgment against Stan Bates. (*Id*. at 202). The default judgment was attached to Thum's proof of claim filed in the FWLL bankruptcy case for $3,799,267.77. (*Id*. at 206).[11] Thum stated that he received between $150,000 and $170,000 of the 2040 Babcock investment in FWLL-MX. (*Id*. at 209).

## C. Dr. David Zehr

Dr. David Zehr has been a licensed medical doctor since 1975. (ECF No. 138, p. 7) (Transcript of November 12, 2017). He has a specialty in catastrophic hand injuries. (*Id*. at 8-10). Zehr relied on Leatherman to do the due diligence on FWLL and the assistance and advice of his attorney, McStay, to invest in FWLL. (*Id*. at 11). Zehr stated that Leatherman had experience in the oil and gas industry and that he expected his advisors to review the financials of FWLL. (*Id*. at 12). Zehr believed FWLL to be a legitimate business. (*Id*. at 13).

---

[11] Thum testified that 2040 Babcock Ltd. invested $1.4 million in the joint venture.

Zehr learned about investing in FWLL from McStay, who was his attorney. (ECF 121 at 230). Zehr stated that his role in ZSV was to contribute money. (*Id*. at 233). Zehr testified that he had a "position" in the TSL JV. (*Id*. at 235). Zehr decided to invest in FWLL on the recommendation of Leatherman. (*Id*.). Zehr understood that his money would be placed into an escrow account and that ZSV would use the escrowed money to purchase frac sand and sell it to a third party. After the sale of the frac sand was completed, the sales proceeds would be placed back into the escrow account and returned to ZSV. (*Id*. at 236). Zehr stated he was aware of the Buffalo Proppants litigation and understood that it was filed to get ZSV's money out of the escrow account. (*Id*. at 237). Zehr agreed that he was not a party to the Proppants lawsuit and was not a party to the settlement. (*Id*. at 237–38). Zehr stated that he was a party to the Settlement and Mutual Agreement between FWLL, TSL, ZSV, McStay, Leatherman, and himself. (*Id*. at 239), P-34. Further, Zehr stated that he had no individual claims against FWLL. (*Id*. at 244). Zehr stated that he has received $25,000.00 from the collection of the Agreed Judgment from FWLL against INVX that was assigned to ZSV. (*Id*. at 248) (ECF No. 138 at 10-11). Zehr believes the value of the judgment to be $380,000.00 (ECF No. 138 at 11). Zehr testified that because of the TSL settlement, he gave up the remainder of his investment of $1.7 million.  (ECF No. 138 at 22).

**D. State Senator Carlos Uresti**

Carlos Uresti is a state senator in the Texas Legislature. (ECF. No. 112, p. 14) (Transcript of trial for September 12, 2017). When not in session, members of the legislature can practice law. Uresti stated that he was an attorney for Four Winds Logistics Laredo, LLC. (*Id*.). Uresti testified that his role at FWLL was to bring in potential investors. (*Id*.). Although Uresti is listed as having a one percent membership interest in FWLL's bankruptcy schedules, he denies that he has any membership interest in FWLL. (*Id*. at 15). Uresti was not an investor in FWLL. (*Id*. at 17). Uresti

stated that he brought Denise Cantu as an investor in FWLL. (*Id*. at 24). Uresti testified that Cantu was a former client who invested $900,000.00 in FWLL. (*Id*. at 24-5). According to Uresti, Cantu received $100,000 back from her investment in FWLL. (*Id*. at 25). Uresti indicated that he received a commission of $27,000.00 because of Cantu investing in FWLL. (*Id*. at 26). Uresti did not represent FWLL in any of the litigation filed against it but did represent FWLL early in its lawsuit against Buffalo Proppants. (*Id*. at 32–40).

Uresti testified that FWLL loaned his law firm $40,000.00 and that the Trustee sued to recover the loan from Uresti. Urest stated that the lawsuit is settled. (*Id*. at 48). Uresti stated that he thought the manner in which the FWLL joint ventures acquired sand and sold it to end users was a Ponzi scheme. (*Id*. at 54). Uresti explained that FWLL could not pay ZSV or Zehr directly because the funds were in escrow. (*Id*. at 69). Uresti stated that the escrowed monies could not be released because there was a dispute regarding ownership of the funds. (*Id*. at 79), P-98. Uresti was initially involved in the litigation with Buffalo Proppants and emailed Bates regarding the status of the litigation and Zehr's demand for repayment through a series of emails. (*Id*. at 80–89), (P-99)-(P-101). Uresti believed that the money in escrow belonged to Zehr. (*Id*. at 92).

**E. Andrew McStay**

McStay is a partner in the law firm of Porto Trueheart & McStay in Houston, Texas. (*Id*. at 104). McStay has a general civil practice focusing on commercial litigation and real estate. (*Id*.). McStay has represented Zehr and Lowell Leatherman for a number of years. (*Id*.). McStay also represented ZSV. (*Id*.). McStay has a 2.5% or 5% membership interest in ZSV. (*Id*. at 105). McStay, Leatherman, and Zehr are the members of ZSV with Zehr having a majority interest of 90-95%. (*Id*. at 106). McStay prepared the TSL JVA. (*Id*. at 107), P-5. ZSV's role was to provide funding to purchase sand. (*Id*. at 108). ZSV loaned money to TSL through a promissory note that

McStay prepared. (*Id*.). P-6. Zehr provided the funding for ZSV. (*Id*. at 109). McStay stated that Bates approached him about any of McStay's clients being interested in investing in FWLL. (*Id*. at 111)(ECF No. 137, p. 222). Bates explained that FWLL was in the sand frac business and McStay believed that Zehr might be interested in investing in FWLL. (*Id*. at 112). As a result, ZSV was formed to enter into a joint venture with FWLL to purchase frac sand. (*Id*. at 116).

McStay explained that Leatherman had a high degree of expertise in the oil patch. (ECF No. 137, p. 223). McStay said that Zehr paid Leatherman to conduct due diligence of FWLL. (*Id*. at 223). McStay said that Leatherman examined market conditions and investigated the frac sand mines used for purchasing the frac sand. (*Id*. at 224). Further, Leatherman also reviewed FWLL's business plan. (*Id.* at 224). Leatherman found that FWLL's logistical ability to transport frac sand in large volumes an important component to investing in FWLL. (*Id*. At 225). Further, FWLL's landlord indicated that FWLL was a good tenant and that FWLL had good access to frac sand. (*Id*. at 227). McStay stated that as part of the joint venture, ZSV would want an escrow agreement for the purchase of frac sand. (*Id*. at 228). McStay explained that the escrow agreement would pay all bills associated with the purchase of the sand so that ZSV could be assured that there would be no unpaid bills. (*Id*. at 228-9).

McStay stated that he believed FWLL to be a legitimate business. (*Id*. at 229). McStay noted that FWLL had an established track record of moving sand. (*Id*. at 230). McStay described ZSV as a special purpose entity created to provide funds for the purchase of sand. (*Id*. at 231). McStay stated that ZSV was not undercapitalized because Zehr put $4.2 million into ZSV. (*Id*.). McStay said that ZSV had no bills. (*Id*. at 232).

McStay explained that ZSV initially received returns that were commensurate with market conditions operating in the Eagle Ford shale (south Texas) at the time frac sand was sold. (ECF

No. 112 at 117). McStay testified that TSL was involved in 3 to 4 frac sand transactions. (*Id.* at 118). The first 2 to 3 transactions resulted in a small return to ZSV. (*Id.* at 119). McStay stated that with each successive order, the accounting and documentation for the transaction was more incomplete. (*Id.* at 121). Further, the return on ZSV's investment took FWLL longer to pay. (*Id.* at 122). Also, McStay testified that he had to put pressure on Bates to get out and sell frac sand so that ZSV could be paid. (*Id.* at 125). McStay wanted Bates to concentrate on acquiring sand to sell to end users and for Bates to understand that there was to be no commingling of ZSV's funds with other joint ventures. (*Id.* at 133-35), P-16. McStay stated that it was important to his clients that Bates perform as stated in the joint venture agreement. (*Id.* at 137). McStay complained to Bates about Bates's lack on initiative and failure to provide acceptable accounting records to him. (*Id.*).

In September 2014, McStay believed that Buffalo Proppants was unable to perform under the contract. (*Id.* at 141). McStay stated that he told Bates that ZSV wanted out of the joint venture with FWLL and a return of its money. (*Id.* at 144) (P-137 at 238). McStay explained that under the escrow agreement, Bates thought FWLL had sixty days to return the money to ZSV. (*Id.* at 145). McStay stated that it was ZSV's intention to have a return of the money it has advanced into escrow be returned to it, and to not rely on another source of funds for repayment. (*Id.* at 150). In an October 3, 2014 email, McStay told Bates that he would attempt to convince Zehr to wait ten more days for payment before he would seek all remedies at law to collect the escrowed money. (*Id.* at 155–57), P-97.

McStay knew that under the Buffalo Proppants Lawsuit, that ZSV nor any member of TSL were a party. (*Id.* at 158). McStay agreed that after the Buffalo Proppants Lawsuit settled, the ZSV Parties, FWLL, and ZSV entered into a separate settlement agreement. (*Id.*), P-34. McStay testified that the settlement proceeds were always to go to Zehr. (*Id.* at 163). McStay acknowledged that

ZSV and Zehr were different defined terms in the TSL Settlement Agreement. (*Id*. at 165), P-34. Further, that the releases provided for in the settlement agreement concerned FWLL and the ZSV Parties. (*Id*. at 166–67), P-34. McStay acknowledged that he had no direct claims against FWLL. (*Id*. at 169). McStay could not place a value on the claims that ZSV released against FWLL because of the settlement. (*Id*. at 170). Further, McStay could not explain if TSL had any claims against FWLL because the settlement agreement terminated the joint venture. (*Id*. at 171–72).

McStay stated that he received the TSL monthly bank statements from Chase Bank. (*Id*. at 176). McStay explained that the deposits for June 2014 in the total amount of $900,000.00 came from Zehr's bank accounts. (*Id*. at 177), P-70. McStay explained that money in the TSL account was withdrawn and deposited in the FWLL bank account. (*Id*.). Further, this was the course of dealing between TSL and FWLL during the summer of 2014. (P-71)-(P-73). The balance in the TSL account was generally drawn down to less than $1,000.00 or at times even to a negative balance. (*Id*. at 177–85) (ECF No. 137 at 255-58) (P-71)(P-74).

McStay testified that the TSL Settlement Agreement was an arm's length transaction. (*Id*. at 206–07). He also stated that the intent of the settlement agreement was to terminate the joint venture, obtain releases from everyone, and get Zehr's money returned to him out of escrow. (*Id*. at 208), P-34. In addition, the original promissory note would be marked "paid in full" and returned to FWLL. (*Id*. at 209).  Further, FWLL would no longer owe the $2.4 million balance on the note. (*Id*.). The ZSV Parties were asked to indemnify FWLL and PCPBJ, which in McStay's opinion was substantial because it was something that FWLL and PCPBJ "wanted badly". (*Id*. at 211–12). McStay stated that the TSL Settlement Agreement resolved any potential lawsuits between the parties that would have been expensive to litigate. (*Id*. at 213). The settlement agreement also provided that if any party breached the settlement agreement that the prevailing party could seek

attorney's fees. (*Id*. at 215–16). McStay stated that he believed the cost of attorney's fees for litigation between FWLL and ZSV would be roughly $150,000.00. (*Id*.). Further, McStay maintained that the releases in the settlement agreement released FWLL from the $4.25 million that Zehr invested in FWLL even though ZSV was not a borrower under the promissory note. (*Id*. at 218-21).

## F. Denise Cantu

Denise Cantu was a client of Carlos Uresti in a wrongful death lawsuit. (ECF No. 137, p. 22)(Transcript of trial for November 8, 2017). Uresti suggested that Cantu invest $900,000.00 proceeds from the wrongful death lawsuit in FWLL. (*Id*.). Cantu believed that Stan Bates was the owner of FWLL. (*Id*. at 24). Cantu explained that Uresti and Bates told her that, after she invested $1 million in FWLL, that if she was dissatisfied with FWLL's performance that she could get her full investment back. (*Id*. at 24). Cantu stated that she received limited documentation about her investment and the returns on her investment. (*Id*. at 27). Cantu believed that Uresti was an investor in FWLL with a 1% membership interest. (*Id*. at 29). Cantu said that she did not get back any of her $900,000.00 investment. (*Id*. at 31). As such, Cantu filed suit on May 22, 2015, in state court against FWLL to recover her investment. (*Id*. at 31–33), P-96. Cantu stated that the lawsuit is still pending. (*Id*. at 34).

## G. Randy Osherow, Chapter 7 Trustee

Osherow has been a lawyer for over 40 years and chapter 7 panel trustee for 32 years. (*Id*. at 38). Osherow has administered over 33,000 cases as a chapter 7 trustee. (*Id*.). Osherow testified that according to Debtor's bankruptcy schedules, Debtor had total assets of $9,631,165.42 and liabilities of $5,516,046.88. (*Id*. at 39), (P-43, TR003271).[12] According to the Debtor's statement

---

[12] "TR_" refers to Trustee bates number.

of financial affairs ("SOFA"), Debtor asserted a claim against Halliburton for $7.5 million. (*Id.*)(P-43, TR003249). Osherow explained that in his judgment, on the advice of counsel, that the Halliburton claim was uncollectible. (*Id.* at 39–40, 87–88). Osherow testified that the inventory listed in question 30 of the schedules indicates roughly 17,000 tons of sand with a value of $233,674.00. (*Id.* at 40)(P-43, TR003250). Osherow testified that the sand sold for $5,000.00. (*Id.* at 41). Osherow also testified that of all the debtor's accounts receivables he only collected $30,000.00 from Carlos Uresti. (*Id.* at 41).

Osherow filed a proof of claim in Bates individual chapter 7 case (Bankruptcy No. 15-52459-CAG) on behalf of creditors in the FWLL case. Osherow believes there will be no more than $214,000 to distribute to Bates's creditors. (*Id.* at 43). Further, Osherow stated that he, as chapter 7 trustee for FWLL, took a default judgment against Stan Bates individually for violations of §§ 523(a)(2), (4), and 727 in the amount of $14,678,723.13. (*Id.* at 43), P-53. Osherow testified that when the Haliburton claim and sale of sand is deducted from the value of Debtor's assets, that Debtor's liabilities exceed Debtor's assets. (*Id.* at 45). Osherow examined the claims docket in Debtor's case and in summary form reviewed each listed claim to determine if FWLL was paying its debt as they became due at the time of the filing of the chapter 11 petition. (*Id.* at 45–55). Upon review of each claim and the status of whether Debtor was timely in its payments, Osherow concluded that Debtor was administratively insolvent. (*Id.* at 56–57).[13]

Osherow also reviewed Debtor's statement of financial affairs, noting that Bates took draws from FWLL of $447,059.32 for the one-year period prior to the filing of Debtor's chapter 11 petition. (*Id.* at 57–59)(P-43, TR003272-3291). Osherow noted that in July 2015 FWLL made

---

[13] Osherow stated that there was some duplication of claims filed in case of roughly $2 million that he could object to as being duplicative. (*Id.* at 113). Osherow noted that even if the duplicate claims were disallowed, the estate would still be administratively insolvent.

two payments—$2,518,394.04 to TSL and $415,358 judgment to TSL—which ultimately resulted in Zehr receiving the $2,581,394.04. (*Id*. at 61). Osherow stated that Zehr did not file any claims against FWLL. (*Id*. at 68). Further, Osherow testified that McStay , ZSV, and TSL did not file any claims against FWLL. (*Id*. at 68–69). Osherow testified that once all the money was removed from FWLL due to the settlement agreement between FWLL and the ZSV Parties, FWLL had no cash, so the releases given the ZSV Parties were worthless. (*Id*. at 70, 99), P-43. Moreover, FWLL did not schedule any claims against the ZSV Parties nor did any party threaten litigation against FWLL because of the settlement agreement. (*Id*. at 71). Osherow also reviewed Debtor's statement of financial affairs and determined that Debtor was paying bonuses to its employees in June 2015 of $7,500.00 each including Bates to keep everyone from quitting. (*Id*. at 74-7). Osherow stated that, given the limited amount of cash in the estate, plus the potential recovery in this adversary proceeding, Osherow believes that the amount of the remaining assets would be substantially less than the $20 million in claims. (*Id*.).

Osherow stated on cross-examination that the schedules as filed reflect assets in excess of liabilities. (*Id*. at 84–85). He acknowledged that the schedules have not been amended. (*Id*.). Osherow stated that he has not recovered any preferential payments to Denise Cantu or Richard Thum because he believed the cost of litigation exceeded the potential recovery. (*Id*. at 90–93). Osherow maintained that ZSV and TSL were simply shell companies with no assets. (*Id*. at 103–04). Osherow explained that with limited resources, it made little sense to object to claims that would not result in the estate receiving more assets or becoming solvent. (*Id*. at 115). Osherow believed that of all the investors in FWLL, it appears that only Zehr, Denise Cantu, and 2040 Babcock Ltd. received money back on their investment. (*Id*. at 118).

### H. Stan Bates[14]

Bates testified at §341 meeting of creditors that FWLL had roughly $20,000.00 in operating account. P-102, p. 14. Bates stated that there had been one payment on Debtor's receivables in the amount of $3,700.00 and gross income of $54,000.00 on the FWLL petition date. P-102, p. 19-21. Bates testified that his salary was 100% of FWLL's net operating profit. P-102, p. 31. Bates stated that the sand listed as an asset on FWLL's schedules was owned by two joint ventures with an indeterminate value. P-102, pp. 36–40. Bates stated that FWLL had not purchased sand for several months prior to filing bankruptcy. P-102, p. 10. Further, Bates explained that FWLL could not buy sand after filing chapter 11 because of the low price of oil. P-102, p. 12.

Bates also provided testimony through a 2004 examination on March 9, 2016. P-103. Bates explained that FWLL's business was to buy, sell, transload, and store frac sand from the mine to the rig site for drilling. P-103, p. 11. Bates stated that he had been investigating the oil field business and its emphasis on frac drilling and elected to enter into the oil business in 2011. P-103, p. 12. Bates decided to go into the frac sand business due to the volume of sand necessary to support drilling. P-103, p. 13. Bates explained that as frac drilling grew in South Texas, he had difficulty in keeping up with the demand. P-103, p. 16. Further, when oil prices started to subside, his high volume customers no longer had a demand for frac sand, and FWLL's revenues dropped

---

[14] Stan Bates and Laura Jacobs were unavailable for trial. Plaintiff asked that excerpts from prior hearings or depositions be admitted into evidence under F. R. Evid. 804(b)(1). Defendants argued against the transcript excerpts being admitted into evidence because the testimony was both hearsay and prejudicial. Additionally, Defendants argued that they were not present to conduct an examination of the witnesses. The parties agreed on the applicable law. The court found under *Battle v. Memorial Hospital at Gulfport et al.*, 228 F.3d 544, 552 (5th Cir. 2000) that the evidence was admissible. Bates testimony is a combination of the following: (1) P-102 (October 15, 2015, transcript of the § 341 meeting in *In re FFWL, LLC* Bankruptcy No. 15-52071-CAG); P-103 (Rule 2004 examination dated March 9, 2016); P-104 (November 18, 2015, hearing transcript in *In re Bates*, Bankruptcy No. 15-52459-CAG involving the appointment of a trustee); P-105 (December 16, 2015, hearing transcript in *In re Bates*, Bankruptcy No. 15-52459-CAG involving the appointment of a trustee); P-106 (December 17, 2015 hearing transcript in *In re Bates*, Bankruptcy No. 15-52459-CAG involving the appointment of a trustee) and testimony of Laura Jacobs, P-106, pp. 144–218).

significantly. P-103, p. 16. Based on the down turn in business, Bates' lawyers advised him to file bankruptcy and FWLL filed chapter 11 bankruptcy on August 27, 2015. P-103, p. 21. Bates maintained that the loss of business with Haliburton, coupled with an inability to sell frac sand to other users, precipitated the FWLL chapter 11 filing. P-103, p. 38. Bates also stated that the money subject to the settlement between the ZSV Parties, FWLL, the Pulman firm, and TSL was all Zehr's money. P-103, p. 79. Further, Bates believed that Zehr lost $400,000-$500,000 in legal fees on the joint venture with FWLL. P-103, p. 79.

Bates explained that the business structure he developed at FWLL was to have a corporate structure with individual "stand alone" joint ventures. P-103, p. 23. Bates stated that the first joint venture was with Zehr through TSL. P-103, p. 24. Carlos Uresti was FWLL's general counsel and Bates's personal attorney. P-103, p. 25. Bates testified that he owned 51% of FWLL, Shannon Smith owned 48%, and Carlos Uresti owned 1%. P-103, p. 26. Bates stated that Denise Cantu invested $900,000.00 through her joint venture FWL-DC and that her loss on her investment (or profit) was shared 50% each between Cantu and Bates. P-103, p. 56. Bates explained that all of the investments in FWLL were made through joint ventures and notwithstanding what the applicable joint venture agreement provided; the course of dealings between the parties in the joint venture did not adhere to the joint venture agreement. P-103, p. 62. Bates stated that given the immediate need for frac sand, and, the cost of transporting the sand, it was difficult to follow what the joint venture required for escrow and payment. P-103, p. 70.

Bates stated that he paid employees advances of their salaries and bonuses to keep them from quitting in the summer of 2015. P-103, p. 171. Bates viewed FWLL as his company and he could do with FWLL as he wanted, including taking draws. P-103, pp. 175-77. Bates stated that Butch Leatherman contacted Bates on behalf of McStay and Zehr to evaluate investment

opportunities in FWLL. P-103, p. 187. Zehr was FWLL's initial investor. P-103, p. 189. Bates stated that Zehr received 80% to 90% of his investment back and his return was greater than other investors. P-103, p. 196-97. Bates testified that he could on behalf of the ZSV Parties elect to reinvest profits from Zehr's contribution back into the joint venture. P-103, p. 209-11. Bates testified that FWLL through him could use Cantu's investment to replace operating capital. P-103, p. 211.

Bates also testified in connection with the involuntary chapter 11 petition filed against him. *See In re Bates*, 545 B.R. 183 (Bankr. W.D. Tex. 2016) (finding that the putative debtor was generally not paying his debts as they became due on the date of bankruptcy). Bates invoked his Fifth Amendment privilege because FWLL was under investigation and that the FBI had seized FWLL's bank records. P-105, pp. 7-8. (transcript of hearing on involuntary petition in *In re Stan Bates*, Bankruptcy No. 15-52459-CAG). Bates invoked his Fifth Amendment right regarding FWLL's operating account. P-105, pp. 97-8. Bates invoked his Fifth Amendment privilege regarding whether he used investor moneys to pay other investors. P-105, p. 102, 110.

### I. Laura Jacobs

Laura Jacobs testified at the hearing on the Bates involuntary chapter 11 petition as to whether an order for relief should be entered. Jacobs worked as the comptroller for FWLL starting in May 2014. P-106, p. 150. Jacobs explained that every joint venture agreement was different. P-116, p. 158. Using Denise Cantu's investment as an example, Jacobs stated that Bates would tell her how much money to transfer back to and investor and the amount. P-106, p. 159. Jacobs also stated that Zehr's investment was the source of funds in TSL. P-106, p. 177. Jacobs explained that Zehr would be paid back his cost of goods plus a profit after he made an investment. Jacobs noted

that generally the amount of the investment in each joint venture was roughly $1.4 million. P-106, pp. 178-80.

## DISCUSSION

### I. FRUADULENT TRANSFER UNDER 11 U.S.C. § 548(a)(1)(B)

Trustee argues that he is entitled to judgment on Count I of the Amended Complaint, which alleges a fraudulent transfer to Zehr that is avoidable under 11 U.S.C. § 548. The Trustee asserts that, FWLL, by and through its attorneys PCPBJ, transferred $2,518,394.09 to Zehr, despite the fact that Zehr had no claim to the money transferred, had no claims against FWLL, and did not provide anything of value to FWLL in exchange for the transfer. The Trustee asserts that the above-described transfer of $2,518,394.09 to Zehr is avoidable under 11 U.S.C. § 548(a)(1)(B) .

Section 548(a)(1)(B) provides in relevant part that:

 (1) The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
* * *
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred[.]

"'Section 548 and fraudulent transfer law generally attempt to protect creditors from transactions which are designed, or have the effect, of unfairly draining the pool of assets available to satisfy creditors' claims, or which dilute legitimate creditor claims at the expense of false or lesser claims.'" ***Redmond et al v. SpiritBank (In re Brooke Corp.)***, 541 B.R. 492, 507 (Bankr. D. Kan. 2015) (quoting 5 COLLIER ON BANKRUPTCY, ¶ 548.01[1][a] at 548–11 (Alan N. Resnick & Henry J. Sommer, eds. in-chief, 16th ed. 2015)). "Section 548 covers two classes of transactions. 'The first class of improper transactions—those made with actual intent—have been condemned for over 450 years.' In the second class, the 'unfairness stems from a disparity of exchange coupled

with the debtor's lack of other assets. . . . In these cases, fraud is presumed.'" *Id*. (quoting 5 COLLIER ON BANKRUPTCY, ¶ 548.01at 548–10).

Additionally, this Court has found that two elements of § 548(a)(1)(B) have been met: (1) that the transfer was made from FWLL to Zehr; and (2) that the transfer was made within two years of the petition date. In addition, the Court found held the transfer of the $2,518,394.09 was a transfer to Zehr as the first and only party that exercised dominion and control over the transfer. *See, e.g., Security First Nat'l Bank v. Brunson (Matter of Coutee)*, 984 F.2d 138, 140–41(5th Cir. 1993) (adopting the dominion and control test). The same reasoning applies to the transfer of the agreed judgment to Zehr. Therefore, Zehr was the initial transferee of, and is strictly liable for, the transfer of the Agreed Judgment and any and all proceeds there from, including the proceeds that Zehr has already received and kept for himself. *See, e.g., Whitlock v. Lowe*, 569 B.R. 94, 99–101 (W.D. Tex. 2017); *see also Rupp v. Markgraf*, 95 F.3d 936, 938–43 (10th Cir. 1996); *Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528, 532–33 (6th Cir. 2003) (stating § 550(a)(1) holds initial transferees "strictly liable for any fraudulent transfers they receive"); *Cullen Ctr. Bank & Tr. v. Hensley (In re Criswell )*, 102 F.3d 1411, 1418 (5th Cir. 1997) (trustees can recover from initial transferee regardless of good faith).

## A. FWLL received less than reasonably equivalent value for the transfer of $2,518,394.09 to Zehr.

The Trustee argues that there is sufficient evidence to demonstrate that Zehr did not give reasonably equivalent value in exchange for the transfer. The Bankruptcy Code does not define "reasonably equivalent value," as used in 11 U.S.C. § 548(a)(1)(B)(i). While 11 U.S.C. § 548(d)(2)(A) does define "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor," courts have been left to judicially define what constitutes

"reasonably equivalent value" for purposes of § 548. To determine whether reasonably equivalent value was provided, many courts have adopted a two-step process.

First, a court determines whether the debtor received an economic benefit at the time of the transfers or obligations. *See **Butler Aviation Int'l, Inc. v. Whyte** (**In re Fairchild Aircraft Corp.**)*, 6 F.3d 1119, 1127 (5th Cir.1993); ***Brandt v. Charter Airlines, LLC** (**In re Equipment Acquisition, Inc.**)*, 511 B.R. 527, 534 (Bankr. N.D. Ill. 2014). Second, the value provided must be "reasonably equivalent" to what the debtor received. *See **Think3 Litigation Trust v. Zuccarello et al.** (**In re Think3, Inc.**)*, 529 B.R. 147, 200 (Bankr. W.D. Tex. 2015); *see also **Abramoff v. Life Ins. Co. of Georgia** (**In re Abramoff**)*, 92 B.R. 698, 703–04 (Bankr. W.D. Tex. 1988). This two-step inquiry considers the value of what was transferred and what was received at the time of the transfer. *See **Gutierrez v. Lomas Mortgage, et al.** (**In re Gutierrez**)*, 160 B.R. 788, 790 (Bankr. W.D. Tex. 1993).

Zehr argues that under the Fifth Circuit's ruling in ***In re Hanover Corp.***, 310 F.3d 796, 802 (5th Cir. 2002) that:

> § 548(c) is not the test that Congress has established to extirpate this form of fraud. The Bankruptcy Court looks, rather, to the "reasonable equivalency" test found at § 548(a)(1)(B)(i). In order to establish a prima facie case for avoiding a transfer as constructively fraudulent, the trustee must demonstrate that the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation." *Id.* This provision ensures that there is no great disparity between the value of the goods exchanged. But it does so, from the perspective of the transferor: Did the transferor "receive[]" enough? *See Fairchild*, 6 F.3d at 1127 ("the recognized test is whether the investment conferred an economic benefit on the debtor").

Further, Zehr argues that the release of claims against the debtor may constitute "reasonably equivalent value," as the term is used in § 548. *See, e.g.*, ***Schwab v. Birches III Property Owners Assoc., Inc.** (**In re Hefner**)*, 262 B.R. 61, 65 (Bankr. M.D. Pa. 2001). Some courts have found that, determining whether a release of pending or possible claims against the debtor pursuant to a settlement provides "reasonably equivalent value" requires the court to analyze the merits of the

pending or threatened litigation. *See* ***Watts v. Peachtree Tech. Partners, LLC, et al.* (*In re Palisades at W. Paces Imaging Ctr.*)*, LLC*, Bankr. No. 09–87600–WLH, Adv. Proc. No. 11–5183, 2011 WL 4459778, at *9 (Bankr. N.D. Ga. Sept. 13, 2011); *see also* ***Carmel v. River Bank Amer., et al.* (*In re FBN Food Serv., Inc.*)**, 175 B.R. 671, 689 (Bankr. N.D. Ill. 1994) (evaluating whether release of claims against the debtor satisfies § 548's "reasonably equivalent value" prong requires courts to undertake some analysis of released claims' merits).  In the present case, Zehr released claims against Debtor under the terms of the TSL Settlement Agreement, but Zehr has admitted that he, individually, did not have any claims against FWLL to release.

Zehr argues that Trustee recognizes that, "as a general rule, the release of claims against the debtor may constitute 'reasonably equivalent value' as the term is used in § 548. Nevertheless, the Trustee contends that Zehr, individually, did not owe anything to the Debtor and vice versa, so Zehr's releases to the Debtor were "illusory." Zehr asserts that the Trustee is asking this Court to ignore long-standing precedent that requires courts to examine all aspects of the transaction (the Settlement) and carefully measure the value of *all* benefits and burdens to the debtor, direct or indirect. Thus, Zehr posits that this Court's inquiry under a constructive fraudulent transfer focuses on whether the Debtor received less than reasonably equivalent value from the entire Settlement— not just Zehr's releases—in exchange for the Settlement Sum. Moreover, Zehr maintains that reasonable equivalency is a fact issue. Zehr suggests that, contrary to the Trustee's assertion, the Court cannot determine, based on the evidence provided, that the Settlement provided the Debtor with less than a reasonably equivalent value in exchange for the Settlement Sum, as a matter of law.

Zehr argues that for the Trustee to succeed on his constructive fraudulent transfer claim against Zehr, the Trustee bears the burden of proof to show that the Debtor received less than

reasonably equivalent value for the transfer of the Settlement Sum. *See* 11 U.S.C. §548(a)(1)(B)(i). Whether the Debtor received reasonably equivalent value is a question of fact. *See **Meeks v. Don Howard Charitable Remainder Tr.,*** 309 B.R. 314, 319 (8th Cir. BAP 2004). Zehr points out that the Trustee recognizes that "the release of claims against the debtor may constitute 'reasonably equivalent value' as that term is used in section 548." Further, Zehr notes that the Trustee also acknowledges that the Settlement includes a release that Zehr, individually, has against the Debtor for, among other things, potential litigation he could commence against the Debtor.

There are two components to the Court's determination under § 548(a)(1)(B)(i): (1) whether the $2,518,394.09 transfer to Zehr was fraudulent; and (2) whether Zehr can transfer the $415,000 judgment to the Trustee and receive credit for the $25,000.00 payment to him?

The facts regarding the payment to Zehr are not in dispute. There were two transactions at issue; the Buffalo Proppants Lawsuit and settlement in which Zehr, as a non-party to the settlement, received both the proceeds of the settlement (the Settlement Sum) and the Agreed Judgment; and the TSL Settlement Agreement that ended the TSL JVA and resulted in the ZSV Parties and FWLL granting releases and indemnification against each other. The Buffalo Proppants settlement involved money, the TSL Settlement Agreement did not.

The Trustee correctly points out that under the TSL Settlement Agreement, only ZSV was to receive money, not Zehr. Zehr has no claim against FWLL. Moreover, Zehr did not loan FWLL any money and that FWLL owed Zehr no antecedent debt. Further, the Court agrees that FWLL did not receive a concrete and identifiable benefit from Zehr under the TSL Settlement Agreement. The record shows that FWLL transferred roughly $2.5 million to Zehr that would have otherwise been available to FWLL's creditors. As noted, Zehr never asserted any claims against FWLL nor

did FWLL schedule any claims against Zehr. When viewing then transfer from FWLL to Zehr, FWLL received nothing of value from Zehr.

The Court finds that the value given by the transferees (Zehr and the other Defendants) is measured as of the time of the transfer, from the perspective of what the transferor (FWLL) received and whether the transfer ultimately resulted in the diminution of FWLL's estate. *See, e.g.,Watts*, 2011 WL 4459778, at *8; *Gugino v. Rowley (In re Floyd)*, 540 B.R. 747,759 (Bankr. D. Idaho 2015) (the indirect benefit must be "sufficiently concrete and identifiable" and "reasonably equivalent" from the point of view of debtors' creditors). "The test for 'reasonably equivalent value' is whether the net economic effect of the transfer was a dissipation of the debtor's estate." *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 567 B.R. 715, 745 (Bankr. S.D. Tex. 2017) (quoting *In re WRT Energy Corp.*, 282 B.R. 343, 405 (Bankr. W.D. La. 2001).

Assuming that the Court is required to measure the exchange of value from the total TSL settlement, the Court finds that FWLL agreed to assign its right, title, and interest in TSL to pay ZSV; pay ZSV $2,518,394.09 in consideration of the settlement; and either pay ZSV the additional sum of $300,000 or assign the Agreed Judgment to ZSV. Further, the evidence at trial showed that the parties agreed to dissolve TSL and grant mutual releases. As noted, Zehr testified that he had no claims against FWLL nor did he have any claims to release. In his testimony, McStay was unable to quantify any releases of claims that FWLL had to release against ZSV. Further, the real impetus for the releases was from PCPBJ, the lawyers for FWLL. Pulman emphasized how important it was for his firm to gain releases from TSL against *both* FWLL and PCPBJ. McStay did offer what he thought might be the cost of any potential litigation regarding the settlement ($150,000), but his testimony is speculative at best because FWLL did not have the ability to sue ZSV and ZSV (Zehr) essentially received what money was left in FWLL at the time of the transfer.

Moreover, while McStay did testify that he marked the TSL-ZSV promissory note "paid in full," the payment had no value to FWLL because the debt belonged to TSL, not FWLL. The Court finds that under the totality of the circumstances urged by Zehr, that what the transferor (FWLL) received was small in comparison to the diminution of FWLL's estate. *See **In re Floyd**, 540 B.R. at 759 (finding reasonable equivalent value was not present where the value transferred from the estate was greater than what the transferor received in return).[15]

Zehr argues that he gave value to FWLL by not collecting on the reminder of his $4.25 million investment in ZSV. The evidence shows that the joint venture agreements contemplated a splitting of both profits and losses. There is nothing in the TSL JVA to suggest otherwise. Therefore, while Zehr did not receive the full amount of $4.25 million investment back, the TSL JVA contemplated that FWLL and TSL would share both profits and losses.

**B. Debtor was insolvent on the date of the transfer to Zehr.**

Finally, the Court finds that the Trustee has met his burden as to whether or not the Debtor was insolvent on the date of transfer. Insolvency is a "financial condition such that the sum of [the] entity's debts is greater than all of [its] property, at a fair valuation . . . ." 11 U.S.C.A. § 101(32) (2018). Courts refer to this as the "balance sheet test". ***Sherman v. FSC Realty LLC*** (***In re Brentwood Lexford Partners, LLC)***, 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003) (citing ***In re Lamar Haddox Contractor, Inc.,*** 40 F.3d 118, 121 (5th Cir. 1994)). To perform the balance sheet test, courts employ a two-step analysis. ***Id***. The first step is for the court to determine if debtor was a "going concern" or, put differently, if the debtor was "on its deathbed."  The second step is for the court to value debtor's assets, based on the status determined by the first step of the analysis. ***Id***. If a debtor is a "going concern," the court will "determine the fair market price of the debtor's

---

[15] Zehr argues that the TSL Settlement was negotiated in good faith. (ECF No. 130 at p. 7–8). Assuming that is true, "good faith" negotiations do not mitigate the Court's finding on reasonably equivalent value.

assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time." *Id*. Accordingly, the Fifth Circuit has held that the fair value of property can be determined "by 'estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions.'" *Id.* (citations omitted). Texas fraudulent transfer law parallels the Bankruptcy Code's approach to insolvency. *Id.* (referring to Tex. Bus. & Comm. Code Ann. § 24.003(a)(West 2018)), which provides that a "debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation"). Section 24.003(b) of the Texas Business and Commerce Code, however, provides that a debtor, like FWLL, "who is generally not paying the debtor's debts as they become due is presumed to be insolvent."

The Court finds that the evidence showed that, at the time of the transfers, FWLL was insolvent, on its financial deathbed, and on the verge of filing bankruptcy. Bates testified that Debtor had not sold frac sand for months prior to filing bankruptcy and could not pay its accounts. Bonuses were paid to employees to keep them from quitting even though FWLL had little cash. Further, by July 2015 when the transfers were made: (a) FWLL owned distressed assets; (b) Halliburton had cancelled its purchase orders; (c) FWLL had laid off almost all of its employees; (d) FWLL was behind on its rent and other bills; and (e) FWLL was facing several lawsuits. As noted, by the time Zehr was paid, the Debtor had no other cash. The Trustee also testified that FWLL was not paying its debts as they came due, which creates a presumption of insolvency under TUFTA. *See* Tex. Bus. & Comm. Code Ann. § 24.003 (West 2018).[16] The evidence also shows that FWLL continued to be insolvent after the transfer to Zehr, and that FWLL's already bad financial condition only got worse during the intervening period, due to the transfer of substantially

---

[16] "A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent." Tex. Bus. & Comm. Code Ann. § 24.003(b) (West 2018).

all of FWLL's assets to Zehr. Based on the foregoing evidence and applicable law, the Trustee carried his burden regarding his constructive fraudulent transfer claims under both 11 U.S.C. § 548(a)(1)(B) and Tex. Bus. & Comm. Code Ann. § 24.006(a) (West 2018).[17]

## C. The assignment of the Agreed Judgment unwinds the alleged fraudulent transfer.

At trial, Zehr offered to assign the $415,000.00 Agreed Judgment to the Trustee subject to the payments that Zehr received on the Agreed Judgment for $25,000.00. Initially, the Trustee appeared to accept the assignment, but balked at accepting it when the Trustee learned that Zehr had been paid $25,000.00. Zehr's counsel argued that the assignment of the Agreed Judgment was "satisfaction" on any alleged fraudulent transfer. Trustee's counsel asserts that Zehr did not provide any facts or evidence that Zehr was the recipient of the Agreed Judgment during discovery. Moreover, Trustee asserts that without a proper accounting of the payments received pursuant to the Agreed Judgment, the Trustee cannot accept the assignment of the Agreed Judgment.

Zehr's counsel argues that the return of the Agreed Judgment unwinds the alleged fraudulent transfer. Further, Zehr's counsel maintains that there was no attempt to conceal the transfer from the Trustee. Zehr testified that he was willing to return the Agreed Judgment to the Trustee. Further, Zehr stated both on direct and cross-examination about the number and amount of the payments received on the Agreed Judgment. The Court finds Zehr's testimony credible, and carefully evaluated Zehr's answers regarding the Agreed Judgment and payments. The Court acknowledges that bank or financial records regarding the payments Zehr received would be better evidence, but the Court is convinced as to Zehr's veracity. As such, the Court finds that the

---

[17] "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Tex. Bus. & Comm. Code Ann. § 24.006(a) (West 2018).

assignment of the Agreed Judgment less the amounts received under the Agreed Judgment satisfies the Trustee's request for a finding of a fraudulent conveyance. Accordingly, the Trustee's claims for relief fails as to the Agreed Judgment, and, Zehr is directed to assign the Agreed Judgment to the Trustee.

## II. ACTUAL INTENT TO HINDER, DELAY, OR DEFRAUD UNDER 11 U.S.C. § 548(a)(1)(A) AND TEX. BUS. & COMM. CODE § 24.005(A)(1)

To prove an intentional fraudulent transfer claim under 11 U.S.C. § 548(a)(1)(A), a plaintiff must show: (a) that a transfer of an interest of the Debtor in property occurred; (b) within two years of the filing of the bankruptcy petition; and (c) with actual intent by the debtor to hinder, delay, or defraud a creditor.[18] Lack of reasonably equivalent value is not an element of a claim under 11 U.S.C. § 548(a)(1)(A). As with the Trustee's constructive fraudulent transfer claim, the first two elements of the Trustee's claim under § 548(a)(1)(A) have already been conclusively established. With respect to the third element of a claim under 11 U.S.C. § 548(a)(1)(A), a debtor's actual intent may be established by direct or circumstantial evidence. *See, e.g., Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008); *see also Osherow v. Wolf (In re Wolf)*, Bankr. Case No. 15-31477-HCM, Adv. Proc. Nos. 16-03002-HCM, 16-03005-HCM, 2016 WL 4940198, at *24 (Bankr. W.D. Tex Sept. 15, 2016). Courts, including the Fifth Circuit, routinely look to "badges of fraud" as circumstantial evidence of a debtor's subjective intent to delay, hinder, or defraud creditors. *E.g., In re Soza*, 542 F.3d at 1067; *see also In re Wolf*, 2016 WL 4940198, at *24.

This Court in *Ingalls v. SMTC Corp.* ( *In re SMTC Mfg. of Texas*), 421 B.R. 251, 298–300 (Bankr. W.D. Tex. 2009) noted that:

---

[18] The Trustee in his pleading to the Court during trial suggested that the FWLL joint ventures were actually Ponzi schemes. The Court cannot discern any evidence to support this assertion. As such, the Court does not base its decision on whether there was a Ponzi scheme through FWLL or the related joint ventures. *See Patek et al. v. Alfaro et al*, 560 B.R. 448, 457 (Bankr. W.D. Tex. 2016) (refusing to apply a Ponzi scheme presumption where plaintiffs failed to allege that "investments were used to pay or to generate artificially high dividends or returns to earlier investors").

In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:

>   (1) the transfer or obligation was to an insider;
>
>   (2) the debtor retained possession or control of the property transferred after the transfer;
>
>   (3) the transfer or obligation was concealed;
>
>   (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
>   (5) the transfer was of substantially all the debtor's assets;
>
>   (6) the debtor absconded;
>
>   (7) the debtor removed or concealed assets;
>
>   (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
>   (9) the debtor was insolvent or became insolvent shortly after a substantial debt was incurred;
>
>   (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
>   (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

(citing Tex. Bus. & Com. Code Ann. § 24.005(b)).The intent that is required for a fraudulent transfer cause of action is not the same intent that is necessary to support an action for fraud. *See Nobles v. Marcus*, 533 S.W.2d 923, 926–27 (Tex.1976) (acknowledging that fraud and fraudulent transfer are distinct causes of action.). Rather, the intent required under TUFTA is simply the intent to hinder, delay, or defraud a creditor by putting assets beyond that creditor's reach. ***In re Reed***, 700 F.2d 986, 991 (5th Cir.1983). Further, the statute expressly authorizes avoidance of any transfer made with intent to hinder, delay or defraud "any creditor" of the debtor. Tex. Bus. & Com. Code Ann. § 24.005(a)(1). The Trustee bears the burden of proof to show, by a preponderance of evidence, that the transfers in question were made by the Debtor with the actual intent to hinder, delay or defraud any creditor of Debtor. The Trustee may prove intent through either direct evidence or circumstantial evidence—i.e., by establishing sufficient badges of fraud that the factfinder is satisfied that the requisite intent has been shown. *SMTC Corp.,* 421 B.R. at 299. The Trustee must prove intent by a preponderance of the evidence. ***Wiggains v. Reed*** (***In re***

*Wiggains)*, No. 14-03065-SGJ, 2015 WL 1954438, *11 (Bankr. N.D. Tex. April 28, 2015) *aff'd*, 848 F.3d 655 (5th Cir. 2017).

The Fifth Circuit has held that the number of badges of fraud necessary to prove intent, to hinder or delay is fact intensive. Courts typically require a "confluence" of multiple badges of fraud to establish actual fraudulent intent, but it is not necessary that all or any one of the badges of fraud be established to support a finding of actual fraudulent intent by the debtor. *See, e.g.*, ***Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners)***, 498 B.R. 679, 712 (Bankr. N.D. Tex. 2013); ***ASARCO LLC v. Americas Mining Corp.***, 396 B.R. 278, 370 (S.D. Tex. 2008) (finding that the statutory badges are non-exclusive). Similarly, for purposes of determining whether a transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor under Tex. Bus. & Comm. Code Ann. § 24.005(a)(1)(West 2018), the Court may consider—as with a claim brought under 11 U.S.C. § 548(a)(1)(A)—either direct or circumstantial evidence ("badges of fraud"). The Court finds that the following badges of fraud present in this case: (a) the transfer or Obligation was concealed; (b) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (c) the transfer was of substantially all the debtor's assets; (d) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; and (e) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. Tex. Bus. & Comm. Code Ann. § 24.005(b).

As set out in the Court's discussion regarding § 548(a)(1)(B), the evidence shows that FWLL did not receive adequate consideration for the transfers between FWLL and Zehr. The Court finds that at the time of the transfers, FWLL: (a) was in dire financial straits and did not

have the capability to make the transfers to Zehr or the other Defendants; (b) was a defendant in pending lawsuits; (c) concealed the transfers by misrepresenting the facts in its SOFA; (d) transferred substantially all of its assets when it made the transfers at issue; and (e) was insolvent at the time of the transfers, or became insolvent shortly after the transfers. The evidence shows that when FWLL paid Zehr, FWLL had no other cash or income to pay creditors at the time of the filing of the chapter 11 petition. In addition, shortly after FWLL filed chapter 11, the case was converted to chapter 7 because FWLL had no ability to pay creditors because it had no income or assets to liquidate. The totality of the circumstances surrounding FWLL and its business practices lend themselves to a conclusion that the transfers were made with actual intent to hinder, delay, or defraud FWLL's creditors, which did not include Zehr.

## II. ZEHR'S STATUTORY DEFENSES UNDER 11 U.S.C. § 548(a) AND TEX. BUS. & COMM. CODE § 24.009(a)

### A. Zehr does not have a valid defense under 11 U.S.C. § 548(c).

The Court previously found that Zehr was the initial transferee of the $2,518,394.09 and that he is strictly liable the transfers. The Court also found that § 548(c) requires a two-step test, using an objective standard. *See Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp. LLC)*, 439 B.R. 284, 310–13 (S.D.N.Y. 2010) (noting that the transferee must be on notice that the transferor was insolvent and that the transfer was made with a fraudulent purpose). Zehr must show that, as the transferee, he took value in good faith and gave value. *In re Hannover Corp.*, 310 F.3d at 799. The Court finds that the evidence at trial shows that McStay and Zehr knew of FWLL's financial problems and insolvency. Moreover, McStay's and Zehr's knowledge of FWLL's financial troubles was the reason that McStay and Zehr insisted that the TSL settlement funds be paid to Zehr, and not ZSV. Zehr and McStay both knew that the TSL settlement did not provide who was entitled to receive the money, but that the money should

have been paid to ZSV. As such, Zehr cannot demonstrate that he took the funds in good faith because the evidence establishes that his motivation to have the TSL settlement funds paid to him was to avoid the prospect of not being paid by FWLL.

A court measures "value" from the transferee's perspective. *In re Hannover*, 310 F.3d at 802. The Fifth Circuit requires a "netting approach" that in demonstrating whether a transferee gave value for a § 548(c) defense. *Williams v. FDIC, (In re Positive Health Mgmt.)*, 769 F.3d 899, 907–09. (5th Cir. 2014). In that regard, the TSL settlement stated that FWLL was to pay ZSV, not Zehr. Zehr did not give any value to FWLL for loans that were made by ZSV or TSL. Moreover, Zehr had no claims to release against FWLL nor did he have any claims against FWLL. As a result, Zehr received the TSL settlement funds of roughly $2.5 million and the Agreed Judgment of $415,000.00 in exchange for releases and claims of significantly less value. The evidence is clear that both McStay and Zehr knew that FWLL was failing and had little cash, so the only funds available to pay Zehr individually were from the TSL settlement. Thus, Zehr's assertion of a good faith defense under § 548(c) fails.

**B. Zehr does not have a defense under Tex. Bus. & Comm. Code Ann. § 24.009(a).**

Section 24.009(a) of TUFTA states that: "(a) A transfer or obligation is not voidable under Section 24.005(a)(1) of this code against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." The Court finds that the same analysis under § 548(c) applies here. As discussed herein, the Court found that Zehr is the initial transferee of the $2,518,394.09, so he is strictly liable for the transfer. Texas applies the similar analysis that bankruptcy law applies to a good faith defense under § 548(c). As the Trustee notes, the Texas Supreme Court, on a certified question from the Fifth Circuit, found that:

> "'reasonably equivalent value' requirement" of a TUFTA § 24.009(a) affirmative defense "can be satisfied with evidence that the transferee [a] fully performed a

lawful, arm's-length contract for fair market value; [b] provided consideration that had objective value at the time of the transaction; and [c] made the exchange in the ordinary course of the transferee's business." ***Janvey v. Golf Channel, Inc.***, 487 S.W.3d 560, 564 (Tex. 2016). As established by the evidence and applicable law set out in this Response, however, Zehr has not satisfied any of those elements, and Zehr's Motion does not show otherwise.

(ECF No. 143 at 59–60).

The Court agrees with the Trustee that Zehr has not meet the elements of a good faith defense under § 24.009(a). As discussed herein, the transaction between FWLL and Zehr was not for fair market value; did not have an objective value that where Zehr gave value equal or close to what FWLL paid Zehr; and there is no evidence that the FWLL-Zehr payment was in the ordinary course of business.[19]

## CONCLUSION

**IT IS ORDERED, ADJUDGED, AND DECREED** that the Plaintiff has proven by a preponderance of the evidence under Count I of the Amended Complaint the avoidance of a transfer to Zehr individually under 11 U.S.C. § 548 in the amount of $2,518, 394.09; and Count II of the Amended Complaint for the avoidance of a fraudulent transfer to Zehr in the amount of $2,518,394.09 for a fraudulent transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act.

**IT IS FURTHER ORDERED** that the Plaintiff has not met his burden under Counts III and IV of the Amended Complaint for avoidance of the transfer of the Agreed Judgment to ZSV and Zehr under 11 U.S.C. §§544 and 548 and TUFTA.

---

[19] The Trustee also plead preference actions under 11 U.S.C. § 547, but made no arguments or offered evidence in support of any preference cause of action under Counts V, VI, and VII. As such, the Court deems those Counts waived. The Trustee also plead in the alternative the necessity of piercing the corporate veil of ZSV to hold Zehr individually liable for the approximately $2.5 million transfer to Zehr. The Court has found that Zehr, as the initial transferee, is strictly liable and, as such, there is no need to pierce the corporate veil. Also, because the Court has found that the assignment of the Agreed Judgment to the Trustee unwinds the alleged fraudulent transfer, the Court does not need to rule on the Trustee's request to pierce the corporate veil on the Agreed Judgment.

**IT IS FURTHER ORDERED** that Zehr is directed to assign the Agreed Judgment to the Trustee.

**IT IS FURTHER ORDERED** that the Plaintiff has not met his burden on Counts V, VI, and VII of a preference to TSL and ZSV of the transfer in the amount of $2,518,394.09 and the Agreed Judgment. The Court dismisses Count VIII of the Amended Complaint for the Trustee's request to pierce ZSV's corporate veil or disregard ZSV's corporate separateness as moot.

**IT IS FURTHER ORDERED** that the Trustee may file his request for attorney's fees and costs as permitted under Fed. R. Civ. P. 54, Fed. R. Bank. P. 7054, and Local Rule 7054.

A Judgment will be entered contemporaneously with this Memorandum Opinion.

A Order Denying Zehr's Motion for Judgement (ECF No. 130) will be entered contemporaneously with this Memorandum Opinion.

All other relief not expressly granted is **DENIED**.

So **ORDERED**.